Filed 2/15/22  P. v. Demorais CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. WEDSON ROSA DEMORAIS, Defendant and Appellant. | F080734 (Stanislaus Super. Ct. No. 127800) **OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ricardo Cordova, Judge.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Levy, Acting P. J., Poochigian, J. and Detjen, J.

## INTRODUCTION

In 1997, appellant and defendant Wedson Rosa Demorais (defendant) fatally stabbed his wife's 79-year-old grandparents, Amelia and Gerrald Hunt. He also stabbed and seriously injured his wife's mother, Lois Miranda. After a jury trial, defendant was convicted of counts 1 and 2, first degree murder with a multiple-murder special circumstance, and count 3, attempted premeditated murder; several enhancements were found true. This court affirmed defendant's convictions in 2002.

In 2019, defendant filed a petition in the Superior Court of Stanislaus County for resentencing pursuant to Penal Code[1] section 1170.95 and alleged his murder convictions were based on the felony-murder rule or the natural and probable consequences doctrine, and that he was not the actual killer. The court denied the petition. On appeal, his appellate counsel has filed a brief that summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) We affirm.

## FACTS[2]

"Defendant and Jean Cardoza married in 1990. They had two sons, Nayo in 1993 and Tavio in 1995. In 1992, defendant and Cardoza lived for one year with Amelia and Gerrald Hunt at their home in Newman. Defendant and Cardoza later moved to Brazil. When she was pregnant with Tavio, Cardoza decided to return on her own to the United

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

[2] Defendant was convicted after a jury trial. The People filed this court's opinion that affirmed his convictions as an exhibit in support of its opposition to defendant's section 1170.95 petition for relief and relied upon the opinion for the factual statement filed with the superior court. The superior court relied on that factual statement to deny relief. On appeal, defendant has similarly relied on this court's opinion for the factual statement in his opening brief.

Given this background, we take judicial notice of the appellate record and this court's nonpublished opinion in *People v. Demorais* (Aug. 7, 2002, F036692) for the factual and procedural background for defendant's convictions. (Evid. Code, § 450, § 452, subd. (d), § 459; *In re W.R.* (2018) 22 Cal.App.5th 284, 286–287, fn. 2.)

2.

States and move back in with her grandparents. Defendant soon joined her. Defendant lived with the Hunts for about one and one-half years prior to the murders.

"Relations between defendant and the Hunts were more strained the second time they lived together than the first. Cardoza testified that her grandparents sometimes treated defendant poorly, but that it was 'a mutual thing.' The Hunts were never physically abusive, but they would get into arguments with defendant. In January 1997, defendant had moved out and was working at a pizza parlor in San Francisco where he shared a small apartment with a roommate. Cardoza remained at her grandparents' house with the children.

"There was also tension between defendant and his mother-in-law, Lois Miranda. Miranda testified she did not attend Nayo's fourth birthday party on January 12, 1997, because defendant was going to be there and she did not want to see him. Miranda believed defendant was manipulating her family, and her parents were going broke because of him. Two or three weeks before the murders, Miranda told Cardoza she suspected defendant was ' "up to something" ' and thought he might try to kidnap the children and take them to Brazil.

"Six or seven months before the murders, defendant and Cardoza went to Fremont to visit her father, Don Cardoza (Don). During this visit, defendant told Don he was unhappy living with the Hunts and that sometimes when he was in the kitchen with them, he felt like picking up a knife off the counter and attacking them. Don told defendant that was the wrong way to think about it and the worst thing he could do. To Don's surprise, defendant kept pursuing the topic and the conversation lasted 10 or 15 minutes. At the time, Don thought defendant was just 'blowing off steam' and did not think anything like that would happen.

"Lizaro Menendes, defendant's San Francisco roommate, testified that defendant was always saying the Hunts did not treat him right. Defendant told Menendes they did

3.

not respect him and said he was no good. Defendant also said that Mr. Hunt called him a 'son-of-a-bitch.'

"Around 3:00 p.m., on January 13, 1997, Cardoza returned from the school where she worked as a substitute teacher. Defendant met her in the doorway. He said he did not feel good and wanted to return to San Francisco. Defendant told Cardoza that he and Mrs. Hunt had argued about the bill for the Texaco credit card, which the Hunts allowed defendant to use to purchase gasoline for his truck. Cardoza decided to cancel the English class she was scheduled to teach that evening and drive defendant back to San Francisco because he seemed very upset.

"After 3:30 p.m., Cardoza went into the kitchen to say goodbye to her family. Defendant went in to say goodbye to Nayo and Tavio. Miranda was seated at the kitchen table. Nayo was sitting on her lap and they were rolling Play Doh® together. While saying goodbye, defendant bent over Nayo and said, ' "I'll be back for you. You won't have to live here." ' He then said something in Portuguese. No angry words were exchanged between defendant and the Hunts, who were also in the kitchen. However, according to Cardoza, there was 'tension in the air.' Mrs. Hunt told Cardoza to 'give the baby to Papa,' referring to Mr. Hunt. Cardoza knew this comment would upset defendant, so she handed Tavio to Miranda instead. Defendant and Cardoza then left the house together.

"After they had driven half a block, defendant told Cardoza he wanted to go back to the house. Defendant told Cardoza that her grandparents were not going to get in the way of him saying goodbye to his children. Cardoza did not think this made sense because defendant had already said goodbye to them. However, she made a u-turn and pulled into the Hunts' driveway. Cardoza stayed in the car because she was afraid defendant was going to say something obnoxious to her grandparents, or vice versa, and she did not want to get into a heated argument over bills.

"Miranda saw the door open and defendant walk into the kitchen. She thought he had forgotten something or was going to get a glass of water. Defendant walked slowly to the sink where Mrs. Hunt was standing. Mr. Hunt was standing nearby, holding Tavio. Miranda was still at the table with Nayo on her lap. Defendant then turned and walked over to them. Miranda opened her arms because it looked like defendant was bending down to kiss Nayo. Miranda then saw 'this flash of a blade,' and felt defendant stab her in the left side of the chest. Nayo either jumped or Miranda threw him from her lap. Defendant stabbed Miranda again in the right side of the chest. He then stabbed her in the leg and twisted the knife. When he pulled it out, Miranda saw the tip of the blade had broken off. Miranda heard her parents exclaim, ' "Oh, my god" ' and ' "Oh no." '

"Next, defendant stabbed Mrs. Hunt in the chest. He then turned and stabbed Mr. Hunt in the chest. Mr. Hunt was still holding Tavio at this point. Defendant continued to stab 'back and forth' between Mr. Hunt and Mrs. Hunt. After trying to knock the knife out of defendant's hands with an aluminum child's chair, Miranda grabbed the telephone from the wall and dialed 911. Miranda set the telephone on the floor and looked around but could no longer see Nayo or Tavio. Miranda left the house to get help. She saw Cardoza sitting in the car and screamed, ' "He's killing them. He's killing them. Call 911." '

"Cardoza got out of the car and went toward the house. When she reached the entryway, she saw that the telephone was off the hook and could tell something awful was happening. She looked into the kitchen and saw Mr. Hunt by the dish rack, grabbing something. Tavio came to Cardoza from the living room and she picked him up. Cardoza backed out of the house, thinking Nayo might be outside. She then went back inside and called for him. Cardoza went to the doorway of the kitchen and saw defendant sitting on top of Mr. Hunt and stabbing him repeatedly. Defendant's back was turned to her and he did not appear to know she was there. Cardoza backed out of the

5.

kitchen and called again for Nayo. Nayo finally came to her out of the left hallway. Cardoza grabbed him, put the children in the car, and drove to the police station.

"Meanwhile, Miranda had walked across the street to the house of Gayle Hunewill (Gayle). Gayle was vacuuming when she heard the front door bell ring and her son, Kevin Hunewill (Kevin), was in his bedroom doing homework. Gayle answered the door and found Miranda on the front porch. Miranda was holding her hand on her leg, which was bleeding. Miranda told Gayle her son-in-law did it and to call 911. Kevin came out of his bedroom. As they were standing on the porch, defendant came out of the Hunts' house and yelled to Miranda to come back.

"Gayle and Kevin brought Miranda into the house. Kevin locked the front door and put the deadbolt on. Defendant tried to coax Miranda to come out of the house by talking to her through the leaded glass window in the front door. Defendant told her to come back and settle it at home. As Gayle was calling 911, Kevin said to defendant, ' "Go home, why don't you just go home." ' Defendant replied, ' "I've got one for you too, American." ' Soon the police arrived and took defendant into custody.

"Another neighbor, Stewart Lawrence, observed defendant coming out of the Hunts' house. As defendant crossed the street, he held up his shirt with his left hand, exposing the lower two-thirds of his torso. Lawrence noticed 'two or three small rivulets' of blood on defendant's torso. In his right hand, defendant held what appeared to be a six-to-eight-inch kitchen knife. Defendant advanced slowly toward the Hunewells' house, taunting Miranda and Gayle and repeating comments like, ' "Now you know what it is like to deal with a man. I'm hurt too. I've been injured." ' Lawrence tried to distract defendant by asking him if he wanted to talk about this. Defendant stopped or slowed to look at Lawrence and said, 'I don't want to talk to you.' After seeing Miranda and Gayle retreat inside the house, Lawrence went to his own house and dialed 911.

6.

"Hector Soria, a police officer with the Newman Police Department, testified that he responded to one of the 911 calls. When he arrived, he saw defendant standing in the street. Defendant turned to face Soria. He held a knife in his right hand and started to lift up his shirt with his left hand. Soria saw blood and a stab wound on defendant's chest. Soria pointed his gun at defendant and ordered him to drop the knife. Defendant, who was about 10 feet away, did not drop the knife but continued to walk toward Soria. Defendant said, ' "Go ahead and shoot me. You want to kill me. Go ahead and shoot me." ' Soria again ordered defendant to drop the knife, but he would not comply. When defendant was about five feet away, Soria pulled the hammer on his gun. Defendant tossed the knife on the ground, fell on his knees, and laid on his back.

"As he was being transported to the hospital, defendant told the paramedic his chest wound was self-inflicted and made some comment about 'abuse.' At the hospital, defendant told one of the nurses his mother-in-law was 'constantly saying things to him that he found upsetting and that … he had … heard those things again that day.' Defendant told another nurse that the Hunts criticized him a lot and it was an ongoing problem of putdowns. Defendant also told the nurse, ' "I went crazy," "I hurt them all, even my children," and "I guess I sure came out of this … thing looking like the bad guy.…" '

"Police collected four knives from the crime scene, including one with a broken tip. The pathologist testified that Mr. Hunt had 16 stab wounds and a bite mark on his left ear. Mrs. Hunt had a total of 36 stab wounds. The pathologist opined that both Mr. and Mrs. Hunt died from multiple stab wounds to the chest, a number of which would have been fatal by themselves."

## PROCEDURAL BACKGROUND

"Defendant was charged by information with two counts of first degree murder (counts 1 & 2; … § 187) and one count of attempted murder (count 3; §§ 664, 187). Regarding all counts, it was alleged defendant personally used a deadly weapon within

7.

the meaning of section 12022, subdivision (b).  Regarding counts 1 and 2, it was alleged the special circumstance of multiple murder applied within the meaning of section 190.2, subdivision (a)(3).  Finally, regarding attempted murder, count 3, it was alleged defendant acted intentionally, deliberately, and with premeditation, and inflicted great bodily injury within the meaning of section 12022.7.

"Defendant pled not guilty and denied the enhancement allegations.  He subsequently pled not guilty by reason of insanity but withdrew the plea at trial.

"A jury found defendant guilty as charged and found all enhancement allegations to be true.  Following the jury's penalty recommendation, the court sentenced defendant to a prison term of life without the possibility of parole on counts 1 and 2.  The court imposed a consecutive sentence of life with the possibility of parole on count 3, plus four years for the great bodily injury and personal use of a deadly weapon enhancements…."

**Defendant's First Appeal**

On August 7, 2002, this court filed a nonpublished opinion that corrected the calculation of defendant's credits and otherwise affirmed his convictions and sentence

This court rejected defendant's argument that the trial court had a sua sponte duty to instruct the jury on voluntary manslaughter based on heat of passion as a lesser included offense of the murder charges, based on the alleged actions by the Hunts.  This court first noted that "for tactical reasons the defense elected not to pursue a theory of voluntary manslaughter," and the defense strategy "was to argue the prosecution's evidence did not support a finding that the murders were deliberate or premeditated.  Thus, defense counsel argued in closing, 'Now, just so we're real clear, the defendant, based on the evidence in front of you, is certainly guilty of a murder, two murders.  He's also guilty of two murders in the second degree.' "

This court held the court did not have a sua sponte duty to instruct because there was insufficient evidence to support defendant's theory for voluntary manslaughter:

"The record in this case does not support defendant's contention the killings occurred upon a sudden quarrel in the heat of passion. The jury convicted defendant of two counts of first degree murder. The evidence reflects, and the jury found, that defendant left and then returned to the Hunts' residence with the preconceived idea of killing the elderly couple. When defendant entered the kitchen, he did not argue or even speak with the Hunts. First, he walked slowly toward where Mrs. Hunt was standing. Then, he walked over to the kitchen table, where Miranda was sitting with Nayo in her lap. Miranda opened her arms to let defendant hug Nayo. Instead, defendant stabbed Miranda twice in the chest and then once in the leg. Defendant next commenced an attack on the Hunts, stabbing each of them multiple times in the chest. These facts fail to demonstrate that there was a sudden quarrel or that defendant killed the Hunts in the heat of passion.

"We disagree that evidence of family tension, the argument about the credit card bill, or Mrs. Hunt's comment about giving the baby to Papa constituted sufficient provocation to warrant voluntary manslaughter instructions. Tension and even hostility between in-laws is not uncommon. Defendant's response to this tension was not that of an ordinary, reasonable person of average disposition. Additionally, the facts show defendant had time to cool down in the car while leaving for San Francisco but deliberately instructed his wife to turn the car around so he could go back to the house and launch his assault on the Hunts. Under the circumstances, there was no error in failing to give sua sponte instructions on the heat-of-passion theory of voluntary manslaughter."

We further found that even if manslaughter instructions should have been given, defendant did not suffer any prejudice from their omission: "The trial court instructed the jury on first and second degree murder. The jury, by convicting defendant of first degree rather than second degree murder, necessarily found the killings were willful, deliberate, and premeditated. The jury was explicitly instructed that, to find the killings were the result of deliberation and premeditation, the intent to kill 'must have been formed upon pre-existing reflection and *not under a sudden heat of passion* or other condition precluding the idea of deliberation....' (Italics added.) Moreover, the jury necessarily rejected the theory of the defense, which was that the evidence supported a finding of second degree but not first degree murder. Because the jury's finding of premeditation

necessarily precluded a finding of heat of passion, defendant suffered no prejudice from any possible error in failing to instruct on voluntary manslaughter."

On October 16, 2002, the California Supreme Court denied defendant's petition for review.

## SENATE BILL NOS. 1437 & 775

The instant appeal involves defendant's petition for resentencing that he filed pursuant to Senate Bill No. 1437 (2017-2018 Reg. Sess. (Senate Bill 1437)), that was effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person *who is not the actual killer*, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citation.]" (*People v. Lewis* (2021) 11 Cal.5th 952, 959, italics added (*Lewis*).)

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief. [Citation.]" (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second

10.

degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019.' [Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' [Citation.]" (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.]" (*Lewis, supra*, 11 Cal.5th at p. 960.)

**Lewis**

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' [Citation.]" (*Lewis, supra*, 11 Cal.5th at p. 957.)

11.

*Lewis* held that after appointing counsel, the trial court could rely on the record of conviction to determine whether the prima facie showing is made "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at p. 971.) The record of conviction includes a prior appellate opinion, although it will be case-specific. (*Id.* at p. 972.) The prima facie finding under section 1170.95, subdivision (c) is limited, and the court must accept the petitioner's factual allegations as true and cannot reject the allegations on credibility grounds without conducting an evidentiary hearing. (*Lewis,* at p. 971.) " 'However, if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' [Citation.]" (*Ibid.*)

**Senate Bill No. 775**

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022. (2020-2021 Reg. Sess.; Stats. 2021, ch. 551, § 1 (Senate Bill 775).) As a result of the amendments, section 1170.95 clarified that "persons convicted of felony murder or murder under the natural and probable consequences doctrine or other theory *under which malice is imputed to a person based solely on that person's participation in a crime*, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a), italics added.)

The amendments also codified the holding in *Lewis* that a petitioner has the right to appointment of counsel, if requested, prior to the court making the prima facie finding: "Upon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1170.95, subd. (b)(3).) After appointment of counsel, the parties shall have the opportunity to submit briefing, and "the court shall hold a hearing

to determine whether the petitioner has made a prima facie case for relief." (§ 1170.95, subd. (c).)

If the petitioner makes a prima facie showing that the petitioner is entitled to relief, the court shall issue an order to show cause. If the court declines to make an order to show cause, it shall provide a statement fully setting forth its reasons for doing so. (§ 1170.95, subd. (c).)

Senate Bill 775 also amended section 1170.95 to clarify that after the court issues the order to show cause and conducts a hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (§ 1170.95, subd. (d)(3).)

"The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022.)

**DEFENDANT'S SECTION 1170.95 PETITION**

On March 20, 2019, defendant filed, in pro. per., a petition in the Superior Court of Stanislaus County for resentencing pursuant to section 1170.95, using a preprinted form, and marked the boxes to allege he was convicted of first or second degree murder

13.

pursuant to the felony-murder rule or the natural and probable consequences doctrine, he was not the actual killer, he did not aid and abet the crimes with intent to kill, he was not a major participant in the felony, he did not act with reckless indifference to human life during the crime or felony, and the special circumstance finding did not bar him from relief. Defendant requested appointment of counsel.

On March 29, 2019, the court appointed counsel for defendant.

**The People's Opposition**

On May 14, 2019, the People filed opposition and argued defendant failed to make a prima facie case and he was ineligible for relief, because he was convicted as the actual killer, and the jury found he personally used a deadly weapon, the knife. As an exhibit to the opposition, the People attached this court's opinion that affirmed his convictions and cited the factual and procedural statements.

The People argued the theories of felony murder or the natural and probable consequences doctrine were not discussed or applied in defendant's case. The statutes that were amended by Senate Bill 1437 did not apply because defendant "acted alone when he personally, intentionally and with premeditation murdered two people and attempted to murder a third."

**The Court's Denial of the Petition**

On July 24, 2019, the court held a hearing on the petition and noted the People filed opposition, but it was not served on defendant's attorney. The court ordered the People to serve counsel and continued the matter.

On August 27, 2019, defense counsel requested an extension of time to file a reply to the People's opposition. The court granted the motion and extended the time to December 2, 2019. Defense counsel did not file a reply

On December 13, 2019, the court held a hearing on the petition. Defendant was not present but represented by counsel, who waived defendant's appearance. The court denied defendant's petition and found section 1170.95 did not apply since defendant did

14.

not "appear to be – to have been convicted of felony murder, and in fact the appellate decision – I did not try this case, but the appellate decision indicates that the defendant was the actual stabber of the victim in this case."[3]

On January 29, 2020, defendant filed a notice of appeal from the court's order of December 13, 2019, that denied his section 1170.95 petition.

## DISCUSSION

As noted above, defendant's counsel has filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that defendant was advised he could file his own brief with this court. By letter on April 27, 2020, we invited defendant to submit additional briefing. To date, he has not done so.

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.[4]

## DISPOSITION

The judgment is affirmed.

---

[3] The People's opposition also asserted Senate Bill No. 1437 was unconstitutional. The court declined to address the constitutional issue since it denied the petition on the merits.

[4] As required by *Lewis* and Senate Bill No. 775's recent amendments, the court appointed counsel to represent defendant, ordered the People to serve counsel with the opposition, granted counsel's request for a continuance to file a reply prior to a hearing on the petition, and held a hearing on the petition and invited argument from both parties.

The superior court properly relied on this court's opinion to find he was the actual killer and deny the petition. (See, e.g., *Lewis, supra*, 11 Cal.5th at pp. 971–972.) The record of his trial shows that defendant was convicted of first degree murder as the actual killer who repeatedly stabbed the victims, and the jury was not instructed on felony murder.